**LINK: 102**

JS - 6

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| Kevin Gribble et al., | ) | **Case No. CV 06-04863 GAF (SHx)** |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER & MEMORANDUM REGARDING MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT |
| Cool Transports Inc. et al., | ) ) | |
| Defendants. | ) ) | |

## I.  INTRODUCTION

This is a putative class action arising from lead plaintiff Christian LaFleur's ("Plaintiff") employment as a truck driver for defendants Cool Transports, Inc. ("Cool Transports") and Rebecca Cool (collectively, "Cool Defendants"), and Van Dyk Tank Lines, Inc. ("Van Dyk") and Ronald Knuckles (collectively, "Van Dyk Defendants"). Among other things, Plaintiff claims that Defendants failed to (1) pay their truck drivers for time spent working "off the clock," (2) provide adequate meal and rest breaks, and (3) pay overtime compensation as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.

On July 3, 2008, this Court preliminarily approved Plaintiff's and the Cool Defendants' Third Amended Settlement Agreement ("TASA") (7/3/2008 Order (Docket No. 101)), which creates two separate classes of plaintiffs: "Settlement Class 1" (the FLSA "opt-in" class); and "Settlement Class 2" (the state law "opt-out" class).

1   Settlement Class 1 consists of truck drivers who worked for the Cool Defendants
2   during the relevant class period and drove solely within the state of California.
3   Settlement Class 2 consists of all members of Settlement Class 1, as well as all other
4   employees who worked as truck drivers for the Cool Defendants during the relevant
5   class period.[1]  Members of Settlement Class 1 will receive 90% of the settlement fund,
6   while the members of Settlement Class 2 will receive the remaining 10%.

7        Plaintiff now moves for final approval of the TASA and for attorneys' fees and
8   court costs.  Plaintiff appears to have complied with all procedural requirements for
9   final approval.  In particular, the Notice of Proposed Class Action Settlement (Budin
10  Decl., Ex. A) appears to have been adequate, and Plaintiff put forth a reasonable
11  effort to deliver the Notice to all 174 potential class members, successfully delivering it
12  to 171 individuals (98%).  Of the 134 individuals who were potential class members of
13  both settlement classes, 74 individuals (55%) returned a timely and completed FLSA
14  consent form.  Of the 174 potential Settlement Class 2 members, 101 individuals
15  (58%) returned a timely and completed claim form.  Thus, at this juncture, 58%
16  (101/174) of the potential class members are in line to receive some relief via the
17  parties' settlement.

18       Despite the relatively small percentage of potential class members who now
19  comprise the settlement classes, the Court concludes that it may grant final approval
20  of the TASA.  Specifically, the strength of Plaintiff's case is questionable, especially
21  given the possibility that Plaintiff's FLSA claims might fail in light of the Motor Carrier
22  Act exemption to the FLSA overtime requirements, 29 U.S.C. § 213(b)(1).  Moreover,
23  the risks and expense associated with maintaining class action status through trial and
24  further litigating this case more than two years after it was filed militate in favor of
25  granting final approval, especially in light of the $170,000 settlement fund the Cool
26  Defendants have offered to pay.  Further, no one has objected to the TASA, and only

27

28

---

[1]As explained below, the Van Dyk Defendants are not parties to the TASA.

two class members opted out of Settlement Class 2.  Accordingly, as explained in further detail below, Plaintiff's motion for final approval of the class action settlement is **GRANTED**.

Plaintiff also moves for an award of attorneys' fees and court costs.  Plaintiff requests 30% of the settlement fund, or $51,000, in attorneys' fees.  The Court **AWARDS** attorneys' fees in the amount of $45,000, or approximately 26.5% of the settlement fund.  The Court also **AWARDS** $5,033.91 in costs pursuant to the FLSA, which mandates the payment of court costs to the plaintiff in the event of settlement. See 29 U.S.C. § 216(b).  Plaintiff's remaining state claims against the Van Dyk Defendants are **REMANDED** to Los Angeles Superior Court.  The Court's reasoning is set forth in greater detail below.

## II.  BACKGROUND

### A. FACTUAL & PROCEDURAL HISTORY

Cool Transports is a trucking business located in California that engages in the intrastate transportation of refined petroleum products used in interstate commerce. In April 2005, Van Dyk, another trucking business, purchased the majority of Cool Transports's assets.  Truck drivers who were employees of Cool Transports thus became Van Dyk employees after the sale.  Van Dyk currently does business as Cool Transports.

On June 19, 2006, plaintiff Kevin Gribble filed the present lawsuit in Los Angeles County Superior Court, alleging three primary grievances: (1) failure to pay employees overtime for time spent working "off the clock;" (2) failure to provide mandatory meal breaks as required by the California Labor Code; and (3) failure to pay overtime as required by the FLSA.  (See First Am. Compl. ¶¶ 23–46.)  Defendants timely removed the action to this Court on August 4, 2006.  (Docket No. 1.)

In July 2007, the Van Dyk Defendants moved for partial summary judgment on Gribble's second and third theories of liability for missed meal breaks and failure to pay overtime.  (Docket No. 41.)  The Court granted summary judgment as to the

3

1    FLSA overtime claims pursuant to the Motor Carrier Act exemption, 29 U.S.C. §

2    213(b)(1), but denied summary judgment as to the state claims.  (See 10/2/2007 Order

3    (Docket No. 66) at 2.)  Subsequently, Gribble and the Cool Defendants entered into a

4    class action settlement agreement.  As part of that agreement, Plaintiff replaced

5    Gribble as the class representative because Gribble's continued participation in that

6    role created a conflict of interest, given his intent to bring separate claims for wrongful

7    termination and retaliation against Defendants.  The Court approved the substitution

8    in November 2007.  (11/7/2007 Order (Docket No. 87).)  After the parties amended

9    the settlement agreement pursuant to the Court's orders to comply with the FLSA's

10   requirements regarding the release of FLSA claims in class action settlements, the

11   Court preliminarily approved the TASA in August 2008.  (8/14/2008 Order (Docket No.

12   101).)

13   **B.  THE TASA'S TERMS**

14        As a threshold matter, the Court notes that the present class action settlement

15   does not include the Van Dyk Defendants.  At oral argument, Plaintiff expressed that it

16   is still in settlement discussions with the Van Dyk Defendants regarding Plaintiff's

17   remaining state claims.  As the Court explains below, those cases are remanded

18   pursuant to 28 U.S.C. § 1367(c).

19        The following is a brief summary of the pertinent terms set forth in the TASA:

20   ● **CLASS PERIOD** – The settlement class period runs from June 19, 2002 to

21   April 28, 2005.  (TASA § II, at 2.)[2]

22   ● **SETTLEMENT CLASSES** – There are two proposed settlement classes:

23   "Settlement Class 1" is the "FLSA 'Opt-In' Class," and "Settlement Class 2" is

24   the "State Law 'Opt-Out' Class."  (TASA § II, at 2.)  The two proposed

25   settlement classes are defined as follows:

26

27

28   [2]Although the TASA does not so state, these dates refer to (1) four years preceding the filing of
the complaint; and (2) the date the Cool Defendants' assets were sold to the Van Dyk
Defendants.  (See Original Proposed Settlement Agreement (Docket No. 82) at 3.)

■ **Settlement Class 1 (FLSA "Opt-In" Class)** – "All persons who are now employed or have been employed by [the Cool Defendants] in the State of California who, on or after June 19, 2002 to April 28, 2005, have worked as an intrastate truck driver hauling goods solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Cool for those excess hours."  (TASA § II, at 2.)

■ **Settlement Class 2 (State Law "Opt-Out" Class)** – "All persons who are now employed or have been employed by [the Cool Defendants] in the State of California who, on or after June 19, 2002 to April 28, 2005, have worked as a truck driver."  (TASA § II, at 2.)

There are a total of 174 potential class members.  (Budin Decl. ¶ 18.) Settlement Class 1 contains 134 potential class members and Settlement Class 2 contains 174 potential class members.  In other words, all members of Settlement Class 1 are presumptive members of Settlement Class 2.  (Budin Decl. ¶ 17.)

● **RELEASES** – The proposed settlement contemplates three separate releases: (1) "Released Federal Claims" (for Settlement Class 1) (see TASA § VII.3, at 7–9); (2) "State Law Released Claims" (for Settlement Class 2) (see TASA § VII.4, at 9–12); and (3) a general release for the Plaintiff only ("General Release") (see TASA § VII.5, at 12–14).

■ **Settlement Class 1 (Released Federal Claims)** – The TASA provides a broad release for all individuals who have opted in to Settlement Class 1.  (TASA § VII.3, at 7–9.)  In particular, the release provides that class members waive all rights

> arising out of, relating to, or in connection with . . . any and all facts, transactions, events, policies, occurrences, acts, disclosures, statements, omissions or failures to act, which

are or could be the basis of claims that Cool Transports, Incorporated and/or Rebecca Cool did not comply with all federal wage and hour laws, including the Fair Labor Standards Act, as well as claims that Cool Transports, Incorporated and/or Rebecca Cool did not pay the Plaintiffs all amounts due for work that was performed by the Plaintiffs for Cool Transports, Incorporated and/or Rebecca Cool; and/or the causes of action asserted in the Class Action, including any and all claims for alleged failure to pay overtime and any and all claims for alleged failure to provide meal periods and/or authorize and permit rest periods.

(TASA § VII.3.e, at 8.)  The TASA also states that the notice to potential class members

shall provide that Settlement Class 1 Members who wish to participate in the Class 1 Settlement must submit a valid and timely FLSA Consent Form . . . .  Further, the Notice shall inform Settlement Class 1 Members that if they do not submit a valid and timely FLSA Consent Form, they will not be entitled to a Settlement Award but they will retain their rights, if any, under the FLSA to proceed individually against the defendants.

(TASA § VII.14.b, at 25.)[3]

■ ***Settlement Class 2 (Released State Claims)*** – The TASA provides a broad release for all individuals who have not opted out of Settlement Class 2.  (TASA § VII.4, at 9–12.)  Notably, the release pertaining to members of Settlement 2 Class expressly does not release federal

---

[3]The Notice of Proposed Class Action Settlement sent to class members complied with this provision, stating in section VI:

Even if you do not object to the proposed Settlement Agreement, you may still exclude yourself from the proposed Class 1 Settlement by simply failing to submit a FLSA Consent Form.

In other words, if you do nothing, that is if you do not submit a FLSA Consent Form, you will not be bound by the Settlement Agreement regarding Settlement Class 1 and will receive no monetary compensation regarding the Class 1 Settlement.

Furthermore, if you do nothing, your individual rights, if any, under Federal Law will be preserved and you will have the right if you so choose to pursue those rights, if any, against the Cool defendants.

(Budin Decl., Ex. A [Not. of Proposed Class Action Settlement] at 4.)

wage and hour claims, instead providing only that class members waive

all rights

> arising out of, relating to, or in connection with . . . [a]ny and all facts, transactions, events, policies, occurrences, acts, disclosures, statements, omissions or failures to act, which are or could be the basis of claims that Cool Transports, Incorporated and/or Rebecca Cool did not comply with all state wage and hour laws, including claims: (a) that Cool did not pay the Plaintiffs all amounts due for work that was performed by the Plaintiffs for Cool Transports, Incorporated and/or Rebecca Cool; (b); and/or that Cool Transports, Incorporated and/or Rebecca Cool owes wages, penalties, interest, attorneys' fees or other damages of any kind based on a failure to comply with any state wage and hour laws, at any times on or before the last day of the Class Period (whether based on California state wage and hour law, contract, or otherwise); and/or the causes of action asserted in the Class Action, including any and all claims for alleged failure to pay overtime pursuant to state law or contract, failure to provide meal periods and/or authorize or permit rest periods and, as related to the foregoing, for alleged unlawful, unfair and/or fraudulent business practices under California Business and Professions Code § 17200, et seq.

(TASA § VII.4.e–f, at 10–11.)  The TASA also provides that any

Settlement Class 2 member who opts out of the class by submitting a

valid, timely request for exclusion "will not be entitled to any recovery

under Settlement Class 2 and will not be bound by the Class 2

Settlement."  (TASA § VII.14.c, at 25–26.)  However, a Settlement

Class 2 member who fails to submit a valid and timely request for

exclusion "shall be bound by all terms of the Class 2 Settlement" even

though she will not receive a settlement award.  (TASA § VII.14.c, at

26.)

▪ ***General Release for Named Plaintiff Only*** – The TASA also

contemplates a separate general release for Plaintiff as the named

class representative.  (TASA § VII.5, at 12–14.)

● **SETTLEMENT FUND** – The Cool Defendants have agreed to pay a total of $170,000 into a settlement fund ("Fund").  (TASA § VII.6, at 14.)  Attorneys' fees, class counsel's costs, claims administration costs, and any applicable employer payroll taxes will all be deducted from the Fund before being distributed to Settlement Class members.[4]  (Id.)  These fees and costs are discussed in turn below.

■ ***Attorneys' Fees and Costs*** – Class counsel moves for an award of attorneys' fees in the amount of $51,000 (or 30% of the Fund), and for reimbursement of his actual costs.  (TASA § VII.9, at 18.)

■ ***Claims Administration Costs*** – Desmond, Marcello & Amster ("DMA") will serve as claims administrator and will be responsible for "determining the amount of payroll deductions to be withheld and drafting and mailing Settlement Award checks to Settlement Class Members, and for such other tasks as the Parties mutually agree or the District Court orders [DMA] to perform."  (TASA § VII.13.c.1, at 26.) However, class counsel has performed various preliminary claims administration functions, such as hiring ABS Pre-Sort, Inc. to print and mail the notices and consent forms to potential class members.  (See TASA § VII.13.c.1, at 22; Budin Decl. ¶ 18.)

■ ***Each Class Member's Share of the Fund*** – After fees, costs, and any applicable employer payroll taxes are deducted from the Fund, the remaining funds will be divided between the two settlement classes as follows: members of Settlement Class 1 will receive 90% of the remaining funds, while members of Settlement Class 2 will receive 10% of the remaining funds.  (TASA § VII.8.d–e, at 15–16.)  Each class member's share of the settlement will be determined as follows:

---

[4]Plaintiff stated at oral argument that he no longer seeks an incentive award.

> The total number of weeks worked by the Settlement Class 1 Members will be added together ("Total Work Weeks"). The number of weeks worked by each Settlement Class 1 Member will be divided by the Total Work Weeks, resulting in a payout ratio for each Settlement Class 1 Member ("Payout Ratio"). The Gross Settlement Amount payable to each Settlement Class 1 Member will be determined by multiplying an individual's Payout Ratio by the remaining Payout Fund ("Gross Settlement Amount").

(TASA § VII.8.d, at 16.)  The same process will be used to determine the share for Settlement Class 2 Members.  (See TASA § VII.8.e, at 16.)  The TASA does not offer specific estimates as to the amounts each member of Settlement Classes 1 and 2 can expect to receive.

■ *No Reversion* – There is no reversion to the Cool Defendants of any unclaimed portion of the Fund; any checks that are not cashed within 90 days of the date of mailing will be turned over to California's Bureau of Unclaimed Property.  (TASA § VII.7, at 14.)

● NOTICE PROCEDURE – Upon preliminary approval of the class settlement, class counsel was to prepare notices to be sent to potential class members via first-class U.S. mail.  (TASA § VII.13.c.2, at 23–24.)  Class members were to return their FLSA Consent Form (Budin Decl., Ex. B) and/or Claim Form (Budin Decl., Ex. C) within 60 days after the date the forms were mailed. (TASA § VII.18, at 27–28; see also Budin Decl., Ex. A [Notice of Proposed Class Action Settlement] at 3.)  The TASA also established a procedure for curing defects whereby a class member who sent in a defective consent or claim form would be given 20 days after notification of the defects to re-submit a proper consent or claim form.  (TASA § VII.18, at 28–29.)

● OBJECTIONS, OPT-INS, AND OPT-OUTS

■ *Objections* – Potential class members who wished to object to the TASA were required to file a written objection with the Court, Plaintiff's

9

counsel, and Defendants' counsel.  (TASA § VII.14.a, at 24.)
Objections were to be filed within 30 days of the mailing date of the
Notice; a class member could not be heard at the final approval hearing
unless she submitted a timely written objection.  (TASA § VII.14.a, at
24.)

■ ***Opting in to Settlement Class 1*** – Potential members of Settlement
Class 1 who wished to participate in the settlement were required to
submit a valid and timely FLSA Consent Form within 60 days of the
mailing of the Notice.  (TASA § VII.18, at 28.)  As noted above, any
potential members who did not opt into Settlement Class 1 retained
their rights under the FLSA.

■ ***Requests for Exclusion/Opting Out of Settlement Class 2*** – The
TASA provided that potential members of Settlement Class 2 who
sought to exclude themselves therefrom were required to submit a
written statement requesting exclusion within 30 days after mailing of
the Notice.  (TASA § VII.14.c, at 25.)  Any potential member of
Settlement Class 2 who opted out would not receive any recovery and
would not be bound by the settlement.  (TASA § VII.14.c, at 25–26.)

### III.  DISCUSSION

**A. FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**1. LEGAL STANDARD**

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or
defenses of a certified class may be settled, voluntarily dismissed, or compromised
only with the court's approval."  Fed. R. Civ. P. 23(e).  There is a two-step process for
approving a proposed class action settlement.  First, the court must determine
whether the proposed settlement deserves preliminary approval.  Nat'l Rural
Telecomms. Coop. v. DirecTV, Inc., 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citation
omitted).  Second, after notice is given to class members, the Court must determine

whether final approval is warranted.  Id.  A court should approve a settlement

pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and

reasonable."  Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993)

(internal quotation marks omitted); accord In re Mego Fin. Corp. Sec. Litig., 213 F.3d

454, 458 (9th Cir. 2000) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th

Cir. 1998)).

In the Ninth Circuit, a court must balance the following factors to determine

whether a class action settlement is fair, adequate, and reasonable:

> (1) the strength of the plaintiff's case;
> (2) the risk, expense, complexity, and likely duration of further litigation;
> (3) the risk of maintaining class action status throughout the trial;
> (4) the amount offered in settlement;
> (5) the extent of discovery completed and the stage of the proceedings;
> (6) the experience and views of counsel;
> (7) the presence of a governmental participant; and
> (8) the reaction of the class members to the proposed settlement.

Torrisi, 8 F.3d at 1375–76 (citation omitted); accord Linney v. Cellular Alaska P'ship,

151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon, 150 F.3d at 1026.  These factors are not

exclusive, and one factor may deserve more weight than the others depending on the

circumstances.  Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir.

1982).  In some instances, "one factor alone may prove determinative in finding

sufficient grounds for court approval."  See Nat'l Rural, 221 F.R.D. at 525–26 (citing

Torrisi, 8 F.3d at 1376).  Moreover, bringing a claim under the FLSA, as Plaintiff does

here, does not change the inquiry into the adequacy of the settlement because the

two inquiries are essentially the same: the court must "scrutiniz[e] the settlement for

fairness."  Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1353 (11th Cir.

1982) (citing Schulte, Inc. v. Gangi, 328 U.S. 108, 113 n.8 (1946)).

## 2. ANALYSIS

### a. Strength of Plaintiff's Case

1        The essence of Plaintiff's suit is that the Cool Defendants have consistently

2  required their truck drivers to work in excess of 40 hours per week but have not made

3  required overtime payments for such work.  (Original Mot. for Prelim. App. ("Original

4  Mot.") (Docket No. 68) at 10–11.)  If this case were to go to trial, Plaintiffs would face

5  considerable risks.  First, on October 2, 2007, the Court granted the Van Dyk

6  Defendants' separate motion for partial summary judgment as to Plaintiff's claims for

7  FLSA overtime on the ground that they were barred by the Motor Carrier Act

8  exemption, 29 U.S.C. § 213(b)(1).  (See 10/2/2007 Order (Docket No. 66) at 19.)  The

9  Court has not yet determined whether the Motor Carrier Act exemption bars Plaintiff's

10  FLSA overtime claims against the Cool Defendants, but the Court's determination of

11  the exemption's applicability to the Van Dyk Defendants suggests that such a

12  determination is plausible, if not probable.[5]  The Court's October 2, 2007 Order thus

13  undermines the strength of Plaintiff's claims against the Cool defendants.  This is

14  especially true given Plaintiff's admission that his overtime wage claims are "the

15  gravamen of this action."  (Mem. at 1.)

16        As to Plaintiff's claim under section 17200 of the California Business &

17  Professions Code ("UCL"), it is not clear whether Plaintiff could prevail on that claim

18  because, as the Cool Defendants apparently would argue at trial, the UCL cannot be

19  used to enforce rights under the FLSA.  Plaintiff's position is well-taken, given the

20  conflicting case law on the issue of whether an FLSA violation may serve as the

21  predicate act under a UCL claim.  Compare, e.g., Harris v. Investor's Bus. Daily, Inc.,

22  41 Cal. Rptr. 3d 108, 114 (Ct. App. 2006) (holding that the FLSA does not preempt

23  section 17200) and Takacs v. A.G. Edwards & Sons, Inc., 444 F. Supp. 2d 1100, 1118

24  (S.D. Cal. 2006) (same), with Mersnick v. USProtect Corp., No. C-06-03993 RMW,

25  2006 WL 3734396, at *10 (N.D. Cal. Dec. 18, 2006) (holding that the federal enclave

26

27    [5]While the record lacks evidence describing the precise nature of the Cool Defendants' trucking
      practices, the fact that Van Dyk acquired most of Cool Transports' assets in the April 29, 2005

28    asset transfer and retained Cool Transports' former truck drivers suggests that Cool Transports'
      trucking practices were very similar to those of Van Dyk.

doctrine prohibits a section 17200 claim that is predicated on violations of federal wage and hour laws).

The complexity and uncertainty surrounding Plaintiff's claim might be significant were the case to proceed to trial.  By settling, Plaintiff will be able to avoid those complexities and secure a fixed sum of compensation for the class members.  Accordingly, this factor weighs in favor of granting the motion for final approval.

### b.  The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The central factor in this prong of the analysis is the expense of litigation.  <u>See</u> <u>Nat'l Rural</u>, 221 F.R.D. at 526.  Settlement between parties is generally preferred to expensive and time-consuming litigation.  <u>Id.</u>

Here, the Cool Defendants have indicated a clear intention and desire to resolve this matter and to avoid protracted litigation and the expenditure of "[s]ubstantial amounts of time, energy and resources" on this case.  (TASA § V, at 4.)  As such, this weighs strongly in favor of final approval.

### c.  The Risk of Maintaining Class Action Status Through Trial

Plaintiff admits that "discovery and investigation have also revealed that the other alleged wage and hour violations in the . . . First Amended Complaint (i.e.[,] failure to provide meal periods, failure to pay for all work) would be much more problematic[] to both certify as class actions and to prevail on the merits." (Mem. at 12.)  Accordingly, if the Cool Defendants were to move for summary judgment on Plaintiff's FLSA overtime claims, maintaining class action status throughout the pendency of the action might be difficult.  Moreover, even if the Cool Defendants did not move for summary judgment, Plaintiff's claims are tenuous here for the reasons discussed in subsection (a) above.  This factor, therefore, weighs in favor of final approval.

### d.  The Amount Offered in Settlement

In analyzing the amount offered in settlement, the Court should examine "the complete package taken as a whole, rather than the individual component parts" to determine whether the proposal is fair.  <u>Officers for Justice</u>, 688 F.2d at 628.  Under the terms of the TASA, the Cool Defendants will pay $170,000 to the Fund.  (TASA § VII.6, at 14.)  After payment of attorneys' fees, court costs, claims administration costs, and any applicable employer payroll taxes, Settlement Class 1 will receive 90% of the amount left in the Fund and Settlement Class 2 will receive the remaining 10%.

The TASA does not estimate how much each claimant may expect to receive. It does, however, provide a formula for calculating individual class members' respective awards:

> The Gross Settlement Amounts payable to the Settlement Class 1 Members will be paid from ninety percent (90%) of the remaining Payout Funds (i.e.[,] those funds remaining after payment of attorney fees and costs, claims administration costs, payroll taxes, and the incentive award to the named plaintiff) and will be calculated by first determining the number of weeks worked by each Settlement Class 1 Member between June 19, 2002 and April 28, 2005.  The total number of weeks worked by the Settlement Class 1 Members will be added together ("Total Work Weeks").  The number of weeks worked by each Settlement Class 1 Member will be divided by the Total Work Weeks, resulting in a payout ratio for each Settlement Class 1 Member ("Payout Ratio").  The Gross Settlement Amount payable to each Settlement Class 1 Member will be determined by multiplying an individual's Payout Ratio by the remaining Payout Fund ("Gross Settlement Amount").  The records of Cool showing the number of weeks worked by each Plaintiff will be dispositive.
>  . . . The Gross Settlement Amounts payable to the Settlement Class 2 Members will be paid from ten percent (10%) of the remaining Payout Funds and will be calculated by first determining the number of weeks worked by each Settlement Class 2 Member between June 19, 2002 and April 28, 2005.  The total number of weeks worked by the Settlement Class 2 Members will be added together.  The number of weeks worked by each Settlement Class 2 Member will be divided by the total weeks worked by all Settlement Class 2 Members resulting in a payout ratio for each Settlement Class 2 Member ("Payout Ratio").  The Gross Settlement Amount payable to each Settlement Class 2 Member will be determined by multiplying an individual's Payout Ratio by the remaining Payout Fund.  The records of Cool showing the number of weeks worked by each Plaintiff will be dispositive.

1   (TASA § VII.8.d–e, at 15–17.)

2        While it may be true that the 90/10 split in settlement proceeds between the

3   classes will result in the members of Settlement Class 1 receiving substantially more

4   money in the aggregate than the members of Settlement Class 2, the breakdown is

5   reasonable in light of Plaintiff's assertion that the overtime wage claims serve as the

6   "gravamen of this action."  (Mem. at 1.)  Moreover, as indicated below, 74 of the 101

7   individuals (73%) who have opted into Settlement Class 1 are also members of

8   Settlement Class 2.  Finally, it is important to remember that the TASA is a better

9   option than not receiving any compensation, which is a reasonable possibility given

10   the questions surrounding Plaintiff's claims and class certification.  The Court

11   therefore concludes that this factor weighs in favor of final approval.

12        **e.  The Extent of Discovery Completed and the Stage of the**

13                  **Proceedings**

14        The amount of discovery completed affects approval of a stipulated settlement

15   to the extent that the parties should be able to evaluate clearly their likely recovery at

16   trial.  In re Xoma Corp. Secs. Litig., No. C-91-2252 (THE), 1992 U.S. Dist. LEXIS

17   10502, at *8 (N.D. Cal. July 10, 1992).  Nevertheless, "[i]n the context of class action

18   settlements, 'formal discovery is not a necessary ticket to the bargaining table' where

19   the parties have sufficient information to make an informed decision about

20   settlement."  Linney, 151 F.3d at 1239 (quoting In re Chicken Antitrust Litig. Am.

21   Poultry, 669 F.2d 228, 241 (5th Cir. 1982)).

22        Here, the original settlement was the result of "several months of

23   negotiations," which included "substantial discovery and negotiations, including an all-

24   day mediation with Robert D. Coviello."  (Mem. at 10.)  As a result, the parties likely

25   had sufficient information to make an informed decision about the terms of the original

26   settlement and, now, the TASA.  This factor thus weighs in favor of final approval.

27

28        **f.  The Experience and Views of Counsel**

1    "Great weight is accorded to the recommendation of counsel, who are most

2    closely acquainted with the facts of the underlying litigation." Nat'l Rural, 221 F.R.D.

3    at 528 (quoting In re Painewebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y.

4    1997)).  Furthermore, a presumption of fairness applies when settlements are

5    negotiated at arm's length, because of the decreased chance of collusion between the

6    negotiating parties.  In re First Capital Holdings Corp. Fin. Prods. Secs. Litig., MDL

7    Docket No. 901 (JGD), 1992 U.S. Dist. LEXIS 14337, at *5–6 (C.D. Cal. June 10,

8    1992).

9         Here, Plaintiff's counsel has extensive experience in numerous class action

10   lawsuits, especially those relating to the trucking industry.  (Budin Decl. ¶¶ 3–5, 16.)

11   After participating in every aspect of this case, including the settlement negotiations

12   that produced the original settlement, Plaintiff's counsel concludes that the terms of

13   the settlement are "fair, adequate, and reasonable and . . . in the best interests of the

14   classes."  (Budin Decl. ¶ 11.)  The parties also affirm that the settlement was a result

15   of arm's-length negotiations.  (TASA § VII.33, at 35.)  Thus, this factor weighs in favor

16   of granting final approval.

17                    **g.  The Presence of a Governmental Participant**

18        This factor is not applicable because there is no governmental participant in

19   this case.  See Nat'l Rural, 221 F.R.D. at 528.

20                    **h.  The Reaction of Notified Class Members to the Proposed**

21                        **Settlement**

22        As stated above, Plaintiff's counsel facilitated the printing and mailing of

23   notices and forms to the potential class members.  Recipients were given 60 days

24   within which to submit their consent and claim forms (TASA § VII.18, at 28), and 30

25   days to raise objections (TASA § VII.14.a, at 24) or to opt out of Settlement Class 2

26   (TASA § VII.14.c, at 25).

27        Of the 134 individuals who are potential class members of both Settlement

28   Classes 1 and 2, 74 individuals (55%) returned timely and completed FLSA consent

16

forms.[6]  (Budin Decl. ¶ 24; Budin First Supp. Decl. ¶ 2; Budin Second Supp. Decl. ¶ 2.)  Of the 174 potential Settlement Class 2 members, 101 individuals (58%) returned timely and completed claim forms.  (Budin Decl. ¶ 25; Budin First Supp. Decl. ¶ 3; Budin Second Supp. Decl. ¶ 3.)  Thus, at this juncture, 58% (101/174) of the potential class members are in line to receive some relief by virtue of the parties' settlement.  Although this is a relatively small percentage of the overall pool of potential class members, the Court notes that, of the 50 notice packets that were initially returned as undeliverable, 47 were ultimately delivered, meaning that all but three potential class members received notice packets.  Moreover, there is no evidence that the 47 individuals who received late-delivered notice packets were not given sufficient time to respond.  To the contrary, Plaintiff's counsel's two supplemental declarations, in which he indicates the receipt of additional consent and claim forms, imply that additional time was provided as required under the TASA.  Thus, the relatively low response rate does not appear to be the fault of either party.  In addition, no potential class members objected to the settlement, although two class members (Kevin Gribble, the original named plaintiff, and Pablo Quintero) opted out of Settlement Class 2.  (Budin Decl. ¶ 23; Budin First Supp. Decl. ¶ 4.)  This factor therefore militates in favor of approval, or at the very least, does not weigh against approval.

### 3. CONCLUSION RE: FINAL APPROVAL

Based on the foregoing analysis, the Court concludes that, on balance, the Torrisi factors weigh in favor of granting final approval in this case.  Accordingly, Plaintiff's motion for final approval of the TASA is **GRANTED**.

### B. ATTORNEYS' FEES

#### 1. LEGAL STANDARD

Rule 23(h) of the Federal Rules of Civil Procedure provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable

---

[6]As a reminder, all members of Settlement Class 1 are necessarily part of Settlement Class 2 because of how the settlement classes are defined.

costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

Under the FLSA, an award of attorneys' fees and court costs is mandatory. See 29

U.S.C. § 216(b) ("The court in such action **shall**, in addition to any judgment awarded

to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the

defendant, and costs of the action." (emphasis added)).

In "common-fund" cases such as the present action, a court has broad

discretion to award attorneys' fees as either a percentage of such common fund, or by

using the lodestar method. Hanlon, 150 F.3d at 1029. Regardless of which method a

court applies, the fee award must be reasonable under the circumstances. In re

Washington Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1294 n.2 (9th Cir.

1994). An award of attorneys' fees as a percentage of the common fund primarily

hinges on whether counsel's specific services benefitted the fund—that is, whether

such services created, increased, protected, or preserved the fund. Class Plaintiffs v.

Jaffe & Schlesinger, P.A., 19 F.3d 1306, 1308 (9th Cir. 1994).

In the Ninth Circuit, the "benchmark" for attorneys' fees in common-fund class

actions is 25% of the common fund. See Paul, Johnson, Alston & Hunt v. Graulty,

886 F.2d 268, 272–73 (9th Cir. 1989); see also Hanlon, 150 F.3d at 1029 (citing Six

(6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990)).

A court can then adjust this percentage upward or downward—to as little as 20% or

as much as 30%—to "account for any unusual circumstances involved in [the] case."

Graulty, 886 F.2d at 272. "Such an adjustment, however, must be accompanied by a

reasonable explanation of why the benchmark is unreasonable under the

circumstances." Id. at 273. Moreover, if an adjustment is made, the district court

must make clear "how it arrive[d] at the figure ultimately awarded."

### 2. ANALYSIS

In the present case, Plaintiff's counsel seeks 30% of the common fund, or

$51,000, in attorneys' fees. (Mem. at 13.) Because counsel seeks fees in excess of

the 25% benchmark established by the Ninth Circuit, the Court must determine

1   whether sufficient "unusual circumstances" warrant an adjustment of the benchmark in

2   this case.  See id. at 272–73.

3          Plaintiff's counsel argues that he is entitled to 30% of the common fund

4   because: (1) he has "reasonably expect[ed] throughout this litigation" that he would

5   receive his "full contingency fee" of 33% (Mem. at 13–14 & n.4); (2) the benchmark for

6   common-fund attorneys' fees ranges from 25% to 33% (id. at 14); (3) Plaintiff's

7   counsel has been awarded attorneys' fees of 30% or more in a number of cases he

8   has litigated (id. at 14–15); (4) Plaintiff's counsel's contingency fee agreement was for

9   33% of Plaintiff's recovery, which "is substantial and probative evidence that the

10  percentage is reasonable for **all** class members" (id. at 15 (emphasis in original))

11  (citing Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002)));[7] and (5) "if

12  attorney fees are not assessed on the same percentage for **all** class participants, a

13  vast majority of class members would [receive] a windfall at [Plaintiff's] expense" (id.

14  at 15–16 (emphasis in original)).  Plaintiff's counsel also notes that no one has

15  objected to the settlement, which set the award of attorneys' fees at 30% of the Fund.

16  (Id. at 16.)  In short, the essence of counsel's various arguments is that he expected

17  to receive 30% in attorneys' fees, and 30% is not an unreasonable percentage.

18         The Court recognizes that counsel's representation in this case led to the

19  creation of the Fund in the first place.  The Court also acknowledges counsel's role as

20  the initial claims administrator after preliminary approval, which, although not justifying

21  an increase in fees, nevertheless indicates that counsel helped protect and preserve

22  the Fund.  Furthermore, the fact that no one has objected to the settlement is

23  evidence of the reasonableness of Plaintiff's request, though this factor is not outcome

24  determinative and must be considered in light of the circumstances.  See Fischel v.

25

26  [7]The cited portion of Vizcaino states: "Where evidence exists, such as here, about the
    percentage fee to which some plaintiffs agreed ex ante, that evidence may be probative of the
27  fee award's reasonableness.  But, to the extent that a market analogy is on point, in most cases
    it may be more appropriate to examine lawyers' reasonable expectations, which are based on
28  the circumstances of the case and the range of fee awards out of common funds of comparable
    size."  290 F.3d at 1050.

1    Equitable Life Assur. Soc'y, 307 F.3d 997, 1007–08 (9th Cir. 2002).  Finally, the Court

2    recognizes that this action has been pending for over two years and has required the

3    parties to litigate substantive motions, including a partial motion for summary

4    judgment (Docket No. 41), and to participate in the day-long mediation that ultimately

5    resulted in the present settlement (Mem. at 2).  Thus, the commencement of the

6    litigation is not so recent that an adjustment to 30% would seem misplaced.  Cf.

7    Fischel, 307 F.3d at 1008 (finding "early settlement" as a factor justifying the district

8    court's refusal to increase the award of attorneys' fees).

9          In light of these facts, and in balancing Plaintiff's counsel's entitlement to

10   attorneys' fees with the class members' interest in obtaining maximum relief for their

11   injuries, the Court concludes that an award of $45,000, or approximately 26.5% of the

12   Fund, is appropriate in this case.  Accordingly, the Court hereby **AWARDS** Plaintiff's

13   counsel $45,000 in attorneys' fees.

14   **C.  COURT COSTS**

15         Plaintiff requests an award of litigation costs in the amount of $5,033.91 for the

16   following services: (1) filing fees ($320); (2) service of process ($100); (3) deposition

17   charges ($2,269.63); (4) mediation ($1,666.67); and (5) claims administration

18   ($677.61).  (Budin Decl., Ex. G.)  Because an award of costs is mandatory under the

19   FLSA, see 29 U.S.C. § 216(b), and because the requested amount of costs appears

20   reasonable on its face and has not been objected to, the Court **AWARDS** Plaintiff

21   litigation costs in the amount of $5,033.91.

22   **D.  REMAINING CLAIMS AGAINST THE VAN DYK DEFENDANTS**

23         On November 10, 2008, the Court issued an Order in which it instructed the

24   Plaintiff to submit a motion for preliminary approval of class action by December 12,

25   2008 with respect to the remaining state claims against the Van Dyk Defendants.

26   (11/10/2008 Order (Docket No. 119).)  The Court did so after Plaintiff expressed at

27   oral argument that he was in settlement discussions with the Van Dyk Defendants

28   regarding the remaining state claims.  Because Plaintiff did not file a motion for

preliminary approval of class action settlement as required by the Court's November 10, 2008 Order, Plaintiff's remaining state claims against the Van Dyk Defendants are **REMANDED** to Los Angeles Superior Court pursuant to 28 U.S.C. § 1367(c).

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for final approval of the TASA is **GRANTED**.  The Court **AWARDS** Plaintiff's counsel $45,000 in attorneys' fees, and **AWARDS** Plaintiff $5,033.91 in litigation costs.  Plaintiff's remaining state claims against the Van Dyk Defendants are **REMANDED** to Los Angeles Superior Court pursuant to 28 U.S.C. § 1367(c).

**IT IS SO ORDERED.**

DATED: December 15, 2008

_____
Judge Gary Allen Feess
United States District Court